**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KENNETH and ROSE MANN as parents and co plenary guardians of the estate of SHELDON MANN, an incapacitated person, | CIVIL ACTION NO. 3:14-CV-00068 |
| Plaintiffs, | (JUDGE CAPUTO) |
| v. | |
| PALMERTON AREA SCHOOL DISTRICT et al., | |
| Defendants. | |

## MEMORANDUM

Presently before the Court is a Motion for Summary Judgment (Doc. 56) filed by Defendants Palmerton Area School District and Christopher Walkowiak ("Defendants").[1] Plaintiffs assert a state-created danger claim arising out of injuries sustained by their son during a high school football practice.  Because Defendant Walkowiak is entitled to qualified immunity and because there is insufficient evidence to establish municipal liability against the School District, Defendants' Motion for Summary Judgment will be granted.

### I. Background

The facts presented in the summary judgment record, viewed in the light most favorable to Plaintiffs, are as follows:

Sheldon Mann ("Sheldon") was a student at Palmerton Area High School and

---

[1]  The Palmerton Area School; Palmerton Area High School; football coaches Travis Fink, Pat Morgans, Mike Falcone, Will Kunkle, Avery Weber, and Ryan McGrath; athletic director Andrew Remsing; and Palmberton School District Board directors Michael Ballard, Carl Bieling, Susan Debski, Carol Dwyer, Stuart Henritzy, Charles Myers, Barry Scherer, Christina Snyder, and Darlene Yeakel were also named defendants who joined in the initial motion for summary judgment.  However, shortly after the motion was filed, Plaintiffs agreed to dismiss these parties with prejudice.  (Docs. 72 & 74.)  Palmerton Area School District and Christopher Walkowiak are the only remaining defendants in this action.

participated in the school's football program beginning in July, 2008.  His parents, Kenneth and Rose Mann ("Plaintiffs"), were appointed co-plenary guardians of his estate on January 13, 2014.  Beginning in 2006, Defendant Christopher Walkowiak ("Coach Walkowiak") was the Assistant Coach of the school's football team and in 2011, he was the Head Football Coach.  (Doc. 57, Defendants' Statement of Facts ("DSF"), ¶¶ 30-31.)   In 2011, in preparation for his Head Football Coach position, Coach Walkowiak received concussion safety training from DeSales University.  (*Id.* ¶ 32.) Based on this training, he was aware of the signs and symptoms of a concussion prior to the 2011 football season.  (*Id.* ¶ 34.)

On November 1, 2011, Sheldon was participating in football practice at Palmerton Area High School.  At some point during the practice, Sheldon sustained a hit, after which he ceased practicing.  Sheldon suffered traumatic brain injury, including second impact syndrome.  There is some evidence that Sheldon sustained two (2) hits at this practice, and that after the first hit, was told to continue practicing by Coach Walkowiak.  Some players testified that after this first hit, Sheldon appeared dazed, confused, and disoriented.

At the time of Sheldon's incident in November 2011, the Palmerton Area School District (the "School District") was using a series of policies and procedures outlined in its 2011-2012 Athletic Handbook (the "Handbook") to inform the coaches and parents about the School District's policies, procedures, rules and regulations, and general guidelines relating to its athletic program.  (*See* Doc. 57-1, Def. Ex. A.) The Handbook outlines several policies requiring, *inter alia*, the exclusion of any player from play who has suffered injury or illness until that player is pronounced physically fit by a physician.  (Doc. 57, DSF, ¶ 3; *see also* Doc. 57-1, Def. Ex. A, at 6.)  The Handbook also details the duties and responsibilities of various employees in the athletic program, including the head coach, who is required to inform the athletic trainer of any injuries that occur during practices or games.  (Doc. 57, DSF, ¶ 8; *see also* Doc. 57-1, Def. Ex. A, at 9.)  Additionally, the Handbook contains a separate section dedicated to the proper handling of injured players.  (Doc. 57-1, Def. Ex. A, at 20.)  The procedures outlined in this section prohibit injured athletes from returning to practice or competition without first being cleared by the athletic trainer.  (*Id.* at 20-21.)  The

2

Handbook does not include any policies or guidelines that specifically address concussions or other head injuries.  The School District also adopted OAA Orthopaedic Specialists' concussion policies, though deposition testimony shows that it is unclear if these policies were written out at the time of Sheldon's incident.  It is undisputed that one year after Sheldon's incident, however, the School District had a written concussion policy in place.

Plaintiffs assert due process claims against the School District and Coach Walkowiak for violating Sheldon's constitutional rights and causing his traumatic brain injuries. Specifically, Plaintiffs claim that Sheldon's rights were violated as a result of Coach Walkowiak's exercise of authority in telling Sheldon to continue participating in football practice after sustaining a hit and exhibiting signs of a concussion.  Plaintiffs also claim that Sheldon's rights were violated as a result of the School District's practice of failing to medically clear student athletes, failing to enforce and enact proper concussion policies, and failing to train the coaches on a safety protocol for head injuries.  The parties engaged in discovery and on February 1, 2016, Defendants filed a motion for summary judgment, arguing that there is insufficient evidence in the record to establish a state-created danger claim against Coach Walkowiak and a municipal liability claim against the School District. (Doc. 56.)  Defendants also argue that even if there were sufficient evidence to establish a state-created danger claim, Coach Walkowiak is entitled to qualified immunity.  This motion has been fully briefed and is now ripe for disposition.

## II. Discussion

### A.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting

3

*Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *Anderson*, 477 U.S. at 247-48.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering whether there are genuine issues of material fact, the court is required to "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.  *Anderson*, 477 U.S. at 256-57.  The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

To prevail on a motion for summary judgment, the non-moving party must show

"specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  Although the non-moving party's evidence may be either direct or circumstantial, and "need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B.    State-Created Danger

Plaintiffs assert a claim for due process violations pursuant to 42 U.S.C. § 1983 ("Section 1983") under the Fourteenth Amendment against the School District and Coach Walkowiak.  In order to state a claim under Section 1983, a plaintiff must show that the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States. *Paratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986).  Although the general rule is that the state has no affirmative obligation to protect its citizens from the violent acts of private individuals, courts have recognized two (2) exceptions to this rule. *Morse v. Lower Merion Sch. District*, 132 F.3d 902, 907 (3d Cir. 1997) (citations omitted).  The first is known as the "special relationship" exception, which allows a plaintiff to recover "when the state enters into a special relationship with a particular citizen . . . [and] fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it owes an affirmative duty." *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir. 1992).  The second is the "state-created danger" theory of liability, which Plaintiffs invoke here.

The state-created danger theory has its origins in the United States Supreme Court's

decision in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), wherein the Court stated that "while the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. The Third Circuit Court of Appeals adopted the "state-created danger" theory in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), concluding that when the harm incurred is a direct result of state action, liability may attach under Section 1983. In *Kneipp*, the Third Circuit adopted a four (4) part test, which was later modified in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006). This test holds a state actor liable if: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) there existed some relationship between the state and the plaintiff such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright*, 443 F.3d at 281. Notwithstanding having adopted this state-created danger test, the Third Circuit has acknowledged the difficulty in establishing such a claim against school officials, and explicitly noted an "aware[ness] of only one such instance in which a state-created danger case against school officials survived summary judgment." *Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006). With this in mind, I turn now to Plaintiffs' claim to see if sufficient evidence has been adduced to survive summary judgment.

### 1.    Foreseeable and Fairly Direct Harm

The first element of a state-created danger claim requires Plaintiffs to establish that the harm alleged was "foreseeable and fairly direct." *Phillips v. Cty. of Allegheny*, 515 F.3d

224, 235 (3d Cir. 2008).  More specifically, this "require[s] a plaintiff to allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  *Id.* at 238.

At the motion to dismiss stage, I held that Plaintiffs adequately pled this element with the following allegations:

> 67.   At all times pertinent hereto, Defendants knew, or should have known, that traumatic brain injuries, including but not limited to concussions, was a common hazard associated with football activities.

> 68.   At all times pertinent hereto, Defendants knew, or should have known, that traumatic brain injuries, including but not limited to concussions, can occur from violent hits during football games and practices.

(Doc. 27, Am. Compl. ¶¶ 67-68; *see also* Doc. 33, at 7-8.)  Now at the summary judgment stage, I find that Plaintiffs have presented evidence sufficient for a reasonable juror to conclude that these allegations are true.  First, Coach Walkowiak testified that he was aware of the hazards and symptoms of concussions prior to Sheldon's injury when the 2011 football season began:

> Q.   What is a concussion?
> A.   A concussion is a brain injury to a player or person that promotes various symptoms–signs and symptoms.
> Q.   Did you know that before you began the 2011 season?
> A.   We were definitely aware of concussions before the season.
> Q.   Were you aware of the symptoms of a concussion before the season?
> A.   Yes.

(Doc. 73-3, Pl. Ex. E, Christopher Walkowiak Dep. Tr., at 10:21-11:6.)  He testified that he took a "very good course" on concussion management protocol and training at DeSales University to help with his job as head football coach, which instructed on, *inter alia*, the signs and symptoms of concussions and when to send an injured player out of the game.  (*Id.* at 10:1-13:13.)  He also testified about his responsibility as a coach to be "vigilant" to see if players are exhibiting signs of a concussion and his responsibility to err on the side of caution and take them out of play if they are.  (*Id.* at 14:16-25.)  He further testified on the ability of hits sustained by players to result in concussions.  (*Id.* at 15:23-17:19.)

Additionally, Plaintiffs have presented evidence from which a reasonable juror could conclude that Coach Walkowiak was aware of Sheldon's first hit and the injury that resulted therefrom. For example, Ryan McGrath, the junior high football coach at the time, testified as follows:

> Q.   Generally what do you recall?
> A.   I just know he got hit hard like a play or two later again.
> Q.   You say again. ***Did–Coach Walkowiak told you that both of the hits were hard***?
> Q.   ***Yes***.

(Doc. 73-3, Pl. Ex. C, Ryan McGrath Dep. Tr., at 54:14-19 (emphasis added).) There is also evidence of an e-mail from Coach Walkowiak to Carol Boyce, the Superintendent of the School District at the time, where he references a "first play" where Sheldon was hit, which Coach Walkowiak characterized as a "stinger":

> 1) The ***first play*** where Sheldon complained of a shoulder injury was not a substantial hit that would merit a big hit or substantial hit tag . . . Sheldon was asked if he was alright, because he was moving his shoulder like if he had discomfort after the play when the team was in the huddle . . .
>
> 2) At the meeting, I said, ***in my opinion, it would have been something like a stinger***. Because he was able to move the shoulder, just seemed to have some discomfort.

(Doc. 73-3, Pl. Ex. D, 1/18/12 E-mail from Walkowiak to Boyce, at 597-98 (emphases added).) Coach Walkowiak also testified that he understood at the time of the incident that a stinger can be a symptom of a concussion:

> Q.   And a stinger can be a symptom of a concussion?
> A.   A stinger would be, yes, a symptom of it, depending where you were hit.
> Q.   And you understood that in 2011, right?
> A.   Yes.

(Doc. 73-3, Pl. Ex. E, Chris Walkowiak Dep. Tr., at 170:7-12.) Collectively, these pieces of evidence are sufficient for a reasonable juror to conclude that Coach Walkowiak (1) knew that traumatic brain injuries, including concussions, were a common hazard to look out for in football; (2) admitted to others in 2011 that Sheldon suffered ***two*** hard hits; (3) admitted to others that the first hard hit appeared to be "something like a stinger"; (4) knew that a

stinger could be a symptom of a concussion; and (5) was aware of his responsibility to "err on the side of caution" and take injured players out of play.  There is also evidence that after his awareness of this first "stinger" hit, he instructed Sheldon to continue playing in practice. (*See, e.g.*, Doc. 73-3, Pl. Ex. K, Alexander Miller Dep. Tr., at 40:13-17.)  In light of this evidence, Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that Sheldon's injury was a "foreseeable and fairly direct" harm.

### 2.    Degree of Culpability that Shocks the Conscience

The second element of Plaintiffs' state-created danger claim requires that Defendants acted with a degree of culpability that "shocks the conscience."  *Sanford*, 456 F.3d at 304 (citation omitted).  The "time in which the government actors had to respond to an incident is of particular significance."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 240 (3d Cir. 2008). In other words, there is an inverse relationship between the level of culpability required to shock the conscience and the time that the state actors had to deliberate, such that the "level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases."  *Sanford*, 456 F.3d at 309.  For example, in a "hyperpressurized" environment, an intent to cause harm is usually required.  *Id.*  However, in cases where deliberation is possible and officials have the time to make "unhurried judgments," deliberate indifference is sufficient.  *Id.*  Moreover, in cases "involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" the relevant inquiry is whether the state actor "consciously disregarded a great risk of harm," with the possibility that "actual knowledge of the risk may not be necessary where the risk is 'obvious.'"  *Id.* Here, there is no indication that this was a "hyperpressurized" situation in which an intent to harm is required.  Therefore, Plaintiffs need only adduce sufficient evidence to establish deliberate indifference.  *Id.*

At the motion to dismiss stage, I held that Plaintiffs adequately alleged the second element of their claim with allegations that (1) Defendants "observ[ed] Sheldon getting hit on the field and subsequently exhibiting symptoms of a head injury"; (2) Defendants then

9

"instruct[ed] him to continue to practice"; and (3) Defendants "were or should have been aware of the risk of continuing to play football with a head injury." (Doc. 33, at 10.) Plaintiffs have presented sufficient evidence to support these allegations to survive summary judgment.  First, as noted above, Plaintiffs presented evidence that Coach Walkowiak observed Sheldon get hit on the field and exhibit symptoms of a head injury through deposition testimony from both Ryan McGrath and Coach Walkowiak as well as an e-mail from Coach Walkowiak to Carol Boyce.  (Doc. 73-3, Pl. Ex. C, Ryan McGrath Dep. Tr., at 54:14-19; Doc. 73-3, Pl. Ex. D, 1/18/12 Email from Walkowiak to Boyce, at 597-98; Doc. 73-3, Pl. Ex. E, Chris Walkowiak Dep. Tr., at 170:7-12.)  Second, Plaintiffs presented evidence through the testimony of other players that after Sheldon's first hit, Coach Walkowiak instructed Sheldon to continue practicing.  (*See, e.g.*, Doc. 73-3, Pl. Ex. K, Alexander Miller Dep. Tr., at 40:13-17.)  Finally, as noted above in my analysis on the first element, Plaintiffs presented evidence showing that Defendants were aware or should have been aware of the risk of continuing to play football with a head injury through Coach Walkowiak's deposition testimony.  (*See, e.g.*, Doc. 73-3, Pl. Ex. E, Christopher Walkowiak Dep. Tr., at 10:21-11:6.) Moreover, Defendants' athletic director, Andrew Remsing, testified that "it would be unacceptable for a coach to allow a player to continue practicing if that player exhibited signs of a concussion."  (Doc. 73-3, Pl. Ex. I, Andrew Remsing Dep. Tr., at 34:3-7.)  Defendants' athletic trainer, David Smith, provided similar testimony.  (Doc. 73-3, Pl. Ex. J, David Smith Dep. Tr., at 26:5-14.)  Collectively, these pieces of evidence are sufficient for a reasonable juror to conclude that Coach Walkowiak had an awareness of risk that was sufficiently concrete to put him on notice of the harm that could result from placing Sheldon back into practice after exhibiting signs of a concussion.

Although Defendants dispute that Coach Walkowiak characterized Sheldon's first hit as a "big hit" and that he was aware that Sheldon was experiencing symptoms of a concussion prior to the "second" hit, Plaintiffs have presented sufficient evidence to create a genuine issue as to whether Coach Walkowiak was aware of this first "big hit" and that

Sheldon was experiencing symptoms of a concussion.  It is for a jury, not this Court, to assess the credibility of this evidence and resolve this factual dispute.

The facts presented here are similar to those presented in *Alt v. Shirey*, No. 11-468, 2012 WL 726579 (W.D. Pa. Feb. 7, 2012), *Report & Recommendation adopted*, 2012 WL 726593 (W.D. Pa. Mar. 1, 2012), which involved a high school football player who experienced a traumatic brain injury as a result of numerous collisions and being placed back into play on numerous occasions.  In *Alt*, the court found that the "shock the conscience" element of the plaintiff's state-created danger claim could be satisfied if it could be proved that the plaintiff "sustained substantial hits to the head . . . in the open view of trainers and coaches," that "Defendants were then alerted to the fact that Plaintiff and other team members could sustain serious head injuries during the course of play," and that the plaintiff subsequently sustained a serious head injury. *Id.* at *12.  If proved, the court held that these facts would show that the defendants were "deliberately indifferent, thereby establishing a level of culpability that was conscience-shocking." *Id.*  Because Plaintiffs have presented sufficient evidence demonstrating very similar facts here–that Sheldon sustained substantial hits during practice in the open view of Coach Walkowiak, that Defendants were aware of the fact that the football team members could sustain serious head injuries during the course of play, and that Sheldon subsequently sustained a serious head injury–I find that a reasonable juror could conclude that this "shock the conscience" element has been satisfied.

### 3.   Foreseeable Victim

To establish the third element of Plaintiffs' claim, they must prove that "a relationship between the state and [Sheldon] existed such that [Sheldon] was a foreseeable victim of the defendant's acts." *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006).  Defendants did not challenge this element at the motion to dismiss stage.  (Doc. 33, at 10.)  However, now at the summary judgment stage, although Defendants concede that a special relationship existed between Sheldon and the District in the educational context, they dispute that Sheldon was a "foreseeable victim" since Defendants acted properly and with due care.

(Doc. 60, at 10.)   However, Plaintiffs have presented sufficient evidence from which a reasonable juror could disbelieve Defendants' assertion that they acted "properly and with due care."   Accordingly, a reasonable juror could find that this element has been satisfied.

### 4.   Affirmative Authority

The last element of Plaintiffs' claim requires showing that Defendants affirmatively used their authority in a way that created a danger to Sheldon or that rendered him more vulnerable to danger than had the state not acted at all.   *Bright*, 443 F.3d at 281. Defendants argue that Plaintiffs failed to adduce sufficient evidence to establish affirmative conduct.   In denying Defendants' motion to dismiss, I held that Plaintiffs' allegations that (1) following Sheldon's first hit, "the coaches told Sheldon to continue to play in the practice," (2) Coach Walkowiak "personally observed Sheldon's disoriented position yet acted in deliberate indifference to his health, safety and welfare by placing him back into practice," and (3) these "decisions by the coaching staff increased the severity of [Sheldon's] signs and symptoms, and/or exposed him to future injuries," were sufficient to establish the final element of Plaintiffs' claim.   (Doc. 33, at 11.)   Because Plaintiffs have presented sufficient evidence from which a reasonable juror could conclude that these allegations are true, summary judgment on this element will be denied.

Plaintiffs presented the deposition testimony of several players who testified that Coach Walkowiak told Sheldon to continue practicing even after being made aware of his first hit.   Although some players testified that they only recalled one (1) hit to Sheldon as opposed to two (2), (*see, e.g.*, Doc. 58-4, Def. Ex. R, Tanner Gutekunst Dep. Tr., at 36:19-22), this testimony creates a factual dispute for the jury to resolve–it is up to the jury to decide which witnesses are credible, not the Court.   Plaintiffs presented sufficient evidence from which a reasonable juror could conclude that Sheldon experienced two (2) hard hits, and that after the first hit, Coach Walkowiak instructed him to return to practice.   This is sufficient to establish an affirmative act.   *See, e.g.*, *Alt*, 2012 WL 726579, at *11 (holding that an "affirmative" act was properly alleged where the plaintiff alleged that the defendants ordered the plaintiff back onto the field after sustaining an obvious head injury).   Based on

12

the evidence in the record, a reasonable juror could believe that Coach Walkowiak ordered Sheldon back onto the field after his first hit, which would constitute an affirmative act, and that this act rendered Sheldon more vulnerable to injury than had the state not acted at all. Accordingly, Plaintiffs have adduced sufficient evidence to establish a prima facie case of their state-created danger claim.

## B.   Qualified Immunity

Defendants argue that even if Plaintiffs can establish their state-created danger claim, Coach Walkowiak is entitled to qualified immunity.  State actors sued in their individual capacity under Section 1983 are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a qualified immunity defense is asserted, a court must determine (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the injury.  *Yarris v. Cty. of Del.*, 465 F.3d 129, 140-41 (3d Cir. 2006) (citation omitted).  Courts may exercise their discretion in deciding which inquiry to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Because I find the issue of clearly established law to be dispositive, I confine my analysis to that issue.

A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  *Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 52 (3d Cir. 2013) (citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011)).  In determining whether a right has been clearly established, the court must define the right with the appropriate level of specificity.  *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).  The Supreme Court has emphasized that "we do not require a case directly on point before concluding that the law is clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (citation and internal quotation marks omitted).

The viability of a state-created danger claim is well-settled. *Hinterberger*, 548 F. App'x

at 52.  However, no published opinion of the Third Circuit has found that a state-created danger arises when coaches fail to take certain precautions in athletic practice or in any analogous situation.  *Id.* at 53.  In *Hinterberger v. Iroquois School District*, a cheerleader suffered a severe closed head injury after attempting the "twist down cradle," a new stunt introduced by her coach at practice in a room without adequate matting.  In analyzing whether the coach was entitled to qualified immunity, the Third Circuit explained that although district court opinions "may be relevant to the determination of when a right was clearly established for qualified immunity analysis," they "do not establish the law of the circuit, and are not even binding on other district courts within the district." *Id.*  Noting that the district court below relied on district court opinions to find that a right was clearly established, the Third Circuit reversed, and concluded that those cases alone did not place the defendant coach on notice that her actions amounted to a constitutional violation.  *Id.* at 53-54.  The Third Circuit emphasized that cases from other courts of appeals also did not support the plaintiff's claim that her alleged constitutional right was clearly established, and cited to various cases that disagreed as to the applicability of the state-created danger doctrine in the context of schools.  *Id.* at 54 (citing cases).  *See, e.g.*, *Priester v. Lowndes Cty.*, 354 F.3d 414, 422 (5th Cir. 2004) (noting that the Fifth Circuit had not adopted a theory of state-created danger and otherwise found no liability for injury sustained to student during football practice).  Fully recognizing the tragic nature of the plaintiff's injury and "the fact that more might have been done to prevent it," the Third Circuit concluded that the alleged constitutional right was not clearly established at the time of her accident.  *Hinterberger*, 548 F. App'x at 54 (citation and internal quotation marks omitted).  The critical portion of the Third Circuit's analysis in reversing the district court and concluding that the defendant coach was entitled to qualified immunity from suit is directly applicable here:

> [Plaintiff] does not cite, and we have not found, any precedential circuit court decisions finding a state-created danger in the context of a school athletic practice.
>
> We thus conclude that [Plaintiff's] alleged right was not clearly established at the time of her accident.

14

*Id.* The Third Circuit further noted that "cases decided in this Circuit after Hinterberger's accident have not been models of clarity as to whether a state-created danger claim can be successfully maintained in the context of school sports." *Id.* at 54 n.2 (citing cases).

The analysis in *Hinterberger* is instructive. Here, Plaintiffs allege that the relevant constitutional right is "the student's right to freedom from school officials' deliberate indifference to, or affirmative acts that increase the danger of, serious injury from unjustified invasions of bodily integrity perpetrated by third parties in the school setting." (Doc. 73. at 36.) In support of this constitutional right, Plaintiffs rely on an opinion from the Eastern District of Pennsylvania, *Sciotto v. Marple Newtown Sch. Dist.*, 81 F. Supp. 2d 559, 568 (E.D. Pa. 1999). However, as explained by the Third Circuit in *Hinterberger*, which was decided in 2013, over a decade after *Sciotto* was decided, this right was not clearly established. *Hinterberger*, 548 F. App'x at 53-54. In fact, the Third Circuit cited *Sciottio* in their opinion, yet still found that the right was not clearly established. *Id.* Because Sheldon's alleged right was not clearly established at the time of his injury, Coach Walkowiak is entitled to qualified immunity. Judgment will be entered in favor of Coach Walkowiak on this claim.

## C.   Municipal Liability

Municipal employers, such as school districts, cannot be held vicariously liable for the constitutional violations committed by their employees. *Monell v. N.Y. City Dep't of Soc. Servs.*, 463 U.S. 658, 694 (1978). Rather, for liability to attach, Plaintiffs must show that the violation of their rights was caused by a policy, custom, or practice of the municipality. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). Plaintiffs must be specific in identifying "exactly what the custom or policy was." *McTernan v. City of New York*, 564 F.3d 636, 658 (3d Cir. 2009). A municipality may be held liable for a substantive due process violation even when none of its individual employees are ultimately found liable. *Sanford*, 456 F.3d at 314. Here, Plaintiffs assert that the School District is liable based both on municipal policies and customs that caused Sheldon's injuries.

A municipal "policy" is made "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck*, 89 F.3d at 971.  A policy may also be established by "a municipality's failure to train its employees." *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp. 2d 516, 524 (M.D. Pa. 2013) (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). To assert liability under this "failure to train" theory, Plaintiffs must show "that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact" and that the "deficiency in training must have actually caused the constitutional violation." *Thomas v. Cumberland Cty.*, 749 f.3d 217, 222 (3d Cir. 2014).  This deliberate indifference standard is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id.* at 223. Under normal circumstances, "a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train."  *Id.*  However, under extraordinary circumstances, a single incident can implicate municipal liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations."  *Id.*

A municipal "custom" exists when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled as to virtually constitute law." *Beck*, 89 F.3d at 971 (citation and internal quotation marks omitted).  In other words, a custom is less official than a policy, and may consist of "a course of conduct so permanent and widespread that it has the force of law."  *Alt*, 2012 WL 726579, at *16 (citations omitted).  To hold a municipality liable for its custom or practice, Plaintiffs must demonstrate that (1) the decision-maker had notice that a constitutional violation could occur; (2) the decision-maker acted with deliberate indifference to this risk; and (3) there is a causal connection between the custom or policy and the violation of the constitutional right.  *Berg*, 219 F.3d at 276.

At the motion to dismiss stage, I held that Plaintiffs adequately alleged a policy or custom pursuant to which Defendants could be held liable based on (1) a policy or custom

of failing to medically clear student athletes; (2) a policy or custom of failing to enforce and/or enact proper and adequate policies for head injuries; and (3) a failure to train the coaches on proper procedures and a safety protocol relating to head injuries.  (Doc. 33, at 15.) However, to survive a motion for summary judgment, Plaintiffs must go beyond the liberal pleading standards and show, through some record evidence, that these policies or customs existed and caused Sheldon's injury.

Here, there is no record evidence to support any formal policy pursuant to which the School District may be held liable.  Specifically, there is no evidence that "any final policy-making official issued any type of official proclamation, policy, or edict whereby the School District formally endorsed" a refusal to medically clear student athletes or to deliberately ignore head injuries.  *Dorley v. South Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 240-41 (W.D. Pa. 2015).  Nor do Plaintiffs identify who made the policy that they claim caused the violation of Sheldon's rights or submit any evidence to support an allegation that the School District's final policy-makers acquiesced in Coach Walkowiak's actions.  *Id.*

Rather, the record evidence shows that at the time of Sheldon's incident, Defendants had a comprehensive policy for evaluating and medically clearing student athletes following an injury.  Defendants point to their 2011-12 Athletic Handbook and the District-adopted OAA Concussion Policies, both of which were made known to the coaches at the time of Sheldon's incident.  (*See, e.g.*, Doc. 73-3, Pl. Ex. E, Chris Walkowiak Dep. Tr., at 23:16-25:20.)  The 2011-12 Athletic Handbook provides that it is Defendants' policy to "exclude any contestant who . . . has suffered illness or injury until that contestant is pronounced physically fit by the school physician."  (Doc. 57-1, Def. Ex. A, at 4.)  It also provides that it is Defendants' policy for the head athletic coach to complete or have the athletic trainer complete accident report forms, submit them to the school nurse, and to inform the athletic trainer of any injuries which occur during practices or games.  (*Id.* at 9.)  The coaches "***must*** follow the recommendation of the Athletic Trainer in all matters regarding the athlete's participation in practices and games."  (*Id.* (emphasis added).)

The Handbook also contains a policy dedicated to the proper handling of injured

17

players, which includes procedures (1) requiring that an injured athlete never be moved until the extent of the of the injury is known and (2) prohibiting student-athletes from returning to practice or competition without being cleared by the athletic trainer first:

> - **Never move an injured athlete** until the extent of the injury is known. Keep the athlete still, comfortable, and reassured. Call the Athletic Trainer immediately, if he is unavailable, contact the Athletic Director. . . .
> - When the Athletic Trainer is available he/she will make the initial assessment of the injury and recommend further action.
> - Call the parents and inform them of the suspected extent of the injury and the recommendations of the Athletic Trainer.
> - If it is determined that the athlete needs treatment, he/she may go to the physician of his/her choice.
> - *The coach and trainer must complete an Injury Report Form as soon as possible* to file with the office.
> . . .
> - *Student-athletes may not return to practice or competition without being cleared by the Athletic Trainer. Without this clearance, the athlete may not participate*. While coaches can discuss injury and playing status with the trainer and physician(s), he/she shall not override a firm recommendation by the trainer and/or physician that a student not participate. *Nor shall coaches seek to persuade players to play against trainer's/physician's orders*.

(*Id.* at 20-21 (last three emphases added).)

Plaintiffs argue that the Handbook was inadequate because it did not specifically address concussions or head injuries, thereby causing Sheldon's injury. However, this argument is misguided. First, this policy of medically clearing athletes is comprehensive enough to apply to student athletes who suffered concussions or head injuries. There is no explanation as to why a policy would need to specifically address concussions or head injuries or what that policy would need to entail, *i.e.*, what types of concussion-specific policies would be needed that were not already captured by the policy relating to other injuries. Second, even if this failure to specifically address concussions deems Defendants' policy inadequate, the fact that a policy is ultimately proved inadequate does not demonstrate deliberate indifference or that the School District was operating according to any official policy designed to ignore concussions and force injured players to continue playing. For example, in *Chambers v. School District of Philadelphia Board of Education*,

587 F.3d 176 (3d Cir. 2009), the plaintiff relied on deposition testimony from the school

district's Director of Special Education Services, who had testified about his "great concern"

over certain services not being provided to the disabled plaintiff and that he "made numerous

calls over numerous time periods and . . . was very upset that this had not been provided."

*Id.* at 193-94 n.23 (3d Cir. 2009) (affirming summary judgment for the defendant school

district because the plaintiffs' reliance on deposition testimony regarding the inadequacies

of educational services failed to establish deliberate indifference for municipal liability claim).

The Third Circuit explained that the plaintiffs' "reliance on this testimony to support their

contention that the School District was deliberately indifferent . . . is misplaced" because "the

fact that the School District's attempts ultimately proved inadequate on several fronts does

not demonstrate that the School District was operating according to any official policy

designed to derail the implementation of that plan or otherwise deny [the plaintiff] educational

benefits to which she was statutorily entitled." *Id.* at 194 n.23.  Accordingly, the Third Circuit

held that the municipality could not be held liable and affirmed the district order granting

summary judgment in favor of the school district.

Plaintiffs rely on *Alt v. Shirey*, No. 11-468, 2012 WL 726579 (W.D. Pa. Feb. 7, 2012),

*Report & Recommendation adopted*, 2012 WL 726593 (W.D. Pa. Mar. 1, 2012), where the

court found that the plaintiff stated a claim for municipal liability based on the defendant's

failure to have procedures in place to recognize traumatic head injuries and provide proper

education on head injuries.  However, the court in *Alt* did not find a plausible claim for

municipal liability based on a mere failure to have a written concussion policy in place, as

Plaintiffs allege here.  Rather, in *Alt*, the court found a plausible claim for municipal liability

based on a "custom or practice of ***ignoring*** the consequences of head injuries," after the

plaintiff was repeatedly injured at numerous games in open view of coaches and trainers,

and "ordering players back onto the field after sustaining blows to the head."  2012 WL

726579, at *16.  This custom was established with allegations of a pattern whereby the

19

defendants repeatedly ignored injuries sustained by the plaintiff at numerous games:

> Plaintiff avers that [Defendants'] failure to recognize and educate their student athletes concerning the causes, symptoms and dangers of traumatic head injuries was a common custom or practice that led to the violation of Plaintiff's constitutional rights.  The factual allegations indicate that ***Plaintiff's injuries at all three games occurred in open view of coaches*** and trainers, ***and that at no time did the District address Plaintiff's injuries or the dangers of head injuries in general***.  Consequently, Plaintiff's factual allegations support his theory of municipal liability that ***the District had a custom or practice of ignoring the consequences of head injuries by ordering players back onto the field after sustaining blows to the head***.

*Id.* (emphases added).

However, unlike in *Alt*, Plaintiffs have submitted no evidence of other injuries or any players repeatedly getting injured "in open view of coaches and trainers," yet being ordered "back onto the field after sustaining blows to the head."  Unlike in *Alt*, there is no evidence of a pattern whereby Defendants repeatedly ignored head injuries.  Plaintiffs cannot point to any evidence of any "practices . . . so permanent and well settled as to virtually constitute law."  *Berg*, 219 F.3d at 275 (citation and internal quotation marks omitted); *see also Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (rejecting a Section 1983 claim against a municipality where the plaintiff "provided no evidence that [the school district's] policy is to ignore the responsibilities imposed by IDEA.  Rather the evidence presented was that [the school district] failed to fulfill its responsibilities.").  This case is more like *Chambers*, where the Third Circuit explained that "[w]hile it is certainly true that the School District in this case too frequently failed to fulfill commitments it had made with respect to [the plaintiff's] education, the record does not support a finding that the School District's policy is to ***ignore*** the responsibilities imposed by the IDEA."  587 F.3d at 194 (emphasis added).  Similarly, here, while it is certainly true that the School District failed to fulfill its commitment to appropriately attend to Sheldon after he was injured during practice, "the record does not support a finding that the School District's policy is to ***ignore***" its responsibilities regarding injured student athletes.  *Chambers*, 587 F.3d at 194.  There was not a pattern of injuries that the School District continually ignored, like there was in *Alt*.  To the contrary, the evidence shows that shortly after Sheldon's injuries in November 2011,

Defendants began discussing how to address concussions and what protocols should be put in place. (*See, e.g.*, Doc. 73-4, Pl. Ex. W (January 2012 e-mails discussing an upcoming meeting about Sheldon's incident, the injury procedures in place, and suggestions for protocol and program improvement); *see also* Doc. 73-4, Pl. Ex. X (January 2012 e-mails discussing written policies dealing with concussions from other schools).)

Plaintiffs' reliance on a failure to train theory to establish municipal liability is equally unavailing. Specifically, Plaintiffs argue that the School District should be held liable based on their failure to train coaches on safety protocol and indicators of a concussion or other head injury. Although the Supreme Court has recognized that in limited circumstances, a municipality may be held liable under a failure to train theory, the Court also explained that a municipality's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (citation and internal quotation marks omitted). Recognizing the difficulty in satisfying such a burden, the Supreme Court has cautioned that any "less stringent standard of fault" under a failure-to-train theory "would result in a de facto *respondeat superior* liability on municipalities." *Id.*

In the context of a failure to train theory, the Third Circuit has consistently held that "a ***pattern of similar constitutional violations*** by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Hinterberger*, 898 F. Supp. 2d at 808 (emphasis added); *Berg*, 219 F.3d at 276 ("Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations."); *see also Connick*, 131 S.Ct. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). Here, a review of the record yields no evidence of a pattern of similar constitutional violations suffered by members of the football team, or any other student-athletes getting injured other than Sheldon that would put the School District on notice of any purported failure to train. *See Hinterberger*, 898 F. Supp. 2d at 808 (finding no municipal liability for this same reason). Plaintiffs point to no evidence in the

record to show that there was a history of the School District *ignoring* the risk of concussions or a pattern of sending injured players back into practice.  There is no evidence of any complaints prior to the date of Sheldon's injury concerning unsafe practices regarding head injuries or instructing injured players to continue playing.  *See, e.g.*, *id.* at 806 (holding that the school district's liability could not be established based on an allegedly deliberately indifferent custom or policy by the School Board because the President of the School Board denied any knowledge of complaints, prior to the date of the plaintiff's injury, concerning unsafe practices by the high school cheerleading squad or the coach in particular).

Nor does the record support the type of "single-incident" liability "hypothesized" by the Supreme Court in *City of Canton, Ohio v. Harris*, 109 S.Ct. 1197 (1989) ("*Canton*").  *Connick v. Thompson*, 563 U.S. 51 (2011).  In *Connick v. Thompson*, the Supreme Court explained that the Court's decision in *Canton* "left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference."  *Connick*, 563 U.S. at 63.  The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force.  *Id.*  Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.  *Id.*

Here, however, the facts, even when construed most favorably to Plaintiffs, do not place this case within the narrow range of situations where "single-incident liability" could reasonably be found.  In *Hinterberger*, the court found that cheerleading coaches were not akin to the hypothetical untrained police officer who, armed with a deadly weapon, must foreseeably make split-second decisions regarding the limits of acceptable force and who presumably lack the means to obtain the necessary training on his own.  898 F. Supp. 2d at 809.  Because the foreseeability of constitutional harm to the cheerleading squad

22

members was not so patently obvious as that described in *Canton*, the court found "no basis upon which the record could support a finding of 'single-incident' liability." *Id.* Similarly, here, the foreseeability of constitutional harm to the football team members was not so patently obvious, particularly given the absence of the need to make split-second decisions like in the hypothetical posed in *Canton*, and given the policies and procedures already in place and outlined in the Athletic Handbook requiring that injured players be cleared by a medical professional before returning to play. Accordingly, Plaintiffs have failed to adduce sufficient evidence for their municipal liability claim.

However, even assuming Plaintiffs have established a policy or custom, they must also demonstrate that the School District, through its deliberate conduct, was the "moving force" behind the injury alleged. *Berg*, 219 F.3d at 276. Where the policy does not facially violate the Constitution, this causation element can only be established by demonstrating that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. *Id.* "A showing of simple or even heightened negligence will not suffice.'" *Id.* Here, Plaintiffs have failed to establish this required causal link.

In *Hinterberger v. Iroquois School District*, 898 F. Supp. 2d 772, 805 (W.D. Pa. 2012), *rev'd on other grounds*, 548 F. App'x 50 (3d Cir. 2013), a cheerleader was injured after attempting a new stunt called the "twist down cradle." While attempting the stunt, the plaintiff flew over and outside the perimeter of her base and her spotters, striking her left hip, left shoulder, and head on the room floor, suffering a severe closed head injury. *Id.* at 779. At the time that the plaintiff struck the floor, there was no matting in place. *Id.* In raising a claim against the School District, the plaintiff challenged the specific policy decision of the High School Athletic Director's refusal to allocate funds for better matting in the room or alternatively, to provide greater access to the high school gym. *Id.* at 805. In rejecting the municipality claim, the court explained that the alleged policy decision could not be said to be the "moving force" behind the plaintiff's injury. Rather, the cause of the plaintiff's injury was the athletic director's affirmative conduct in introducing the squad to the new stunt in an unsuitable environment. "Although the [athletic director's] refusal to supply higher qualify

matting may have been a factor that ultimately contributed to Plaintiff's injury, it was not the 'moving force' behind Plaintiff's injury because ultimately, it was [the coach], not [the athletic director], who made the determination to proceed with the introduction of the stunt under dangerous conditions." *Id.* at 805.

Similarly, here, the School District's failure to implement a policy that specifically addressed concussions and head injuries, and the School District's purported failure to train their employees in addressing concussions and head injuries, cannot be said to be the "moving force" behind Sheldon's injury. Although the lack of an adequate policy may have "ultimately contributed" to Sheldon's injury, it was not the "moving force" behind Plaintiff's injury because ultimately, it was Coach Walkowiak, not the School District or Athletic Director, who made the determination to send Sheldon back into practice after his first hit. *Id.* Plaintiffs have also failed to establish causation because even if the School District did have a concussion policy or protocol in place, it likely would not have had any effect on the situation because Plaintiffs have pointed to no evidence that Coach Walkowiak actually believed that Sheldon was suffering from concussive symptoms. Accordingly, Plaintiffs have failed to adduce sufficient evidence for their municipal liability claim. Judgment will be entered in favor of the School District.

### III. Conclusion

Unfortunately, the tragic story of Sheldon's injury is not an anomaly. In 2008, Ryne Dougherty, a high-school linebacker, sustained a concussion during football practice. Michael S. Schmidt, *School Set to Discuss Concussion Guidelines*, N.Y. Times, Oct. 22, 2008, at B17. After a normal CT scan and sitting out for the required period, he returned to the field, only to collapse and suffer a brain hemorrhage, resulting in his death. Examples of other young football players who have suffered serious injury after sustaining a concussion include Zackery Lystedt, a middle-school student who, in 2006, suffered permanent brain damage after sustaining a concussion and an additional hit in the same game, and Zachary Frith, a high-school freshman who, in 2005, also suffered permanent brain damage after sustaining a concussion during a football game and then staying in the

game.  I do not take these stories lightly.  However, as a matter of law, I cannot side-step the well-established doctrines of qualified immunity and municipal liability.  Although it can be said that the School District and Coach Walkowiak could have acted differently and done more to prevent Sheldon's head injuries, I cannot say that their conduct rises to the level of constitutional violations that make them liable in a court of law.

Accordingly, for the above stated reasons, Defendants' Motion for Summary Judgment will be granted.  An appropriate order follows.


June 2, 2016 _____                             /s/ A. Richard Caputo _____
Date                                             A. Richard Caputo
                                                 United States District Judge